RESTAURANT DEVELOPMENT GROUP, Appellant, v. HEE SUK OH, Appellee.

First District (Illinois Workers' Compensation Commission Division)

No. 1—08—2143WC

Opinion filed June 16, 2009.

Alvin R. Becker, of Beerman, Swerdlove, Woloshin & Barezky, of Chicago, for appellant.

Steven W. Jacobson, of Jacobson & Sorkin, Ltd., of Chicago, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

On October 14, 1999, claimant, Hee Suk Oh, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)), seeking benefits from employer, Restaurant Development Group, for injuries she suffered

from a stray bullet. Following a hearing, an arbitrator found claimant proved she sustained accidental injuries arising out of and in the course of her employment with employer and awarded claimant permanent total disability (PTD) benefits for life pursuant to section 8(e)(18) of the Act (820 ILCS 305/8(e)(18) (West 2004)), commencing on September 4, 1999. The arbitrator also ordered employer to pay $80,108.19 for necessary medical expenses incurred by the claimant.

On review, the Workers' Compensation Commission (Commission) affirmed and adopted the arbitrator's decision. The circuit court confirmed the Commission's decision and this appeal followed.

In August 1999, employer owned and operated a group of restaurants, one of which was the Coast restaurant located at 2134 N. Damen in the Bucktown neighborhood of Chicago. The Coast restaurant had not yet officially opened but had been operating with a series of soft openings in preparation for the grand opening. In August, employer hired claimant to bartend at its new restaurant. At the time, claimant was residing in the Village of Lincolnwood but she was familiar with the Bucktown neighborhood, as she had lived in neighboring Wicker Park during the years 1992 through 1995.

During her years as a Wicker Park resident, claimant often heard gunfire from her apartment. She also heard gunfire regularly when she visited her former boyfriend who resided on Wabansia in Bucktown, which is not far from the location where the Coast restaurant would later open in 1999. In 1995, claimant moved away to live at her mother's residence on Touhy Avenue in Lincolnwood. She was still living at her mother's home a few years later when she accepted the bartending position with the Coast restaurant in August 1999. Employer hired claimant to work Wednesdays through Saturdays, from 8 p.m. to 2 a.m. The neighborhood was in the process of gentrifying but to claimant there still existed an element of danger.

The Coast restaurant was located on Damen Avenue at the intersection of Damen and Shakespeare. Damen and Shakespeare form a "T" intersection with Damen running north and south and Shakespeare running east until it ends at Damen. The Coast restaurant was situated on the east side of Damen and faced west. A motorist traveling east on Shakespeare would be facing directly toward the front of Coast restaurant. The Coast restaurant was a ground-level business abutting the sidewalk and fronted with floor-to-ceiling glass windows.

On September 4, 1999, around midnight, claimant was working as a bartender and standing near the bar when a stray bullet fired from outside the restaurant pierced the floor-to-ceiling windows and struck her in the back. Claimant learned that the shooting was gang-related

and two men were later charged and convicted in connection with the shooting. The two men involved in the shooting were gang members living near the Coast restaurant on Oakley Avenue.

The police report was admitted into evidence, consisting of a general offense report, a typewritten Area 5 supplementary report describing the field investigation, two typewritten Area 5 supplementary reports describing the results of lineups before two witnesses, and additional handwritten supplementary reports describing the arrest of two individuals and the physical evidence. According to the police report, two gang members were chasing rival gang members in vehicles as they drove eastbound on Shakespeare toward Damen, while firing several shots at the other vehicle. Several bullets entered the Coast restaurant and one of them struck claimant in the back, paralyzing her from the waist down.

Sergeant John Pallohusky of the Chicago police department headed the criminal investigation. Claimant introduced into evidence the deposition of Pallohusky. Pallohusky had been a member of the Chicago police department for 16 years at the time he testified. On the night of the shooting at Coast, Pallohusky was a detective assigned to the Area 5 violent crimes unit.

Pallohusky had extensive experience over the course of his career dealing with violent crimes and gun-related crimes. Pallohusky also had experience dealing with street gangs. Earlier in his career as a tactical officer, Pallohusky was assigned primarily to narcotics and gang-related shootings and homicides on the west side. When he was promoted to the rank of detective, Pallohusky was assigned to shootings, violent crimes, and homicides within the detective division. As a detective, Pallohusky also worked with the "Aggravated Battery Mission Team," a special team created to focus on gang-related shootings and homicides. Pallohusky testified that he has devoted the majority of his career to investigating violent crimes and gun-related crimes. Pallohusky had risen to the rank of sergeant by the time of his deposition.

Pallohusky testified that the Chicago police department divides the city into five areas. Each area is further subdivided into districts and there are a total of 25 districts in the City of Chicago. According to Pallohusky, the shooting that injured claimant occurred in the 14th District in Area 5. Pallohusky was familiar with the amount of violent crime and gang-related crime that was taking place in the 14th District at the time of the shooting. Pallohusky was also familiar with the statistical data for violent crime and gang-related crime in the City of Chicago.

According to Pallohusky, the 14th District had "probably the largest collection of multiple gangs within the city itself." At the time of

claimant's shooting, the P.R. Stones, Spanish Lords, and the Insane Unknowns had been involved in gang shootings and narcotics-related shootings, and were fighting over territory. The 14th District had a reputation in 1999 for gang problems, and gang-related shootings were known to erupt over territorial boundaries or invasion by one gang or another onto another gang's turf. The majority of the gang violence that Pallohusky dealt with was gun-related and the "Aggravated Battery Mission Team" he was assigned to was created in part to prevent retaliation from one shooting to the next. Pallohusky also testified that despite the gentrification taking place, there existed a lot of gang violence and shooting in the area of the Coast restaurant. The majority of the shootings in that area occurred after 8 p.m., and they occurred at a higher rate on weekends.

Pallohusky testified that the crime rate for violent crime was higher in the 14th District than the majority of the city's 25 districts on and before September 4, 1999. Pallohusky also stated that gun-related crime was higher in the 14th District than in the majority of the other districts. Moreover, the crime rates for violent crime and gun-related crime were higher in the 14th District in 1999 on a *per capita* basis than in Cook County and the State of Illinois as a whole. Pallohusky opined that a person was at a higher risk for being a victim of a gun-related crime in the 14th District in September 1999 compared to other districts. The risk was also greater for the 14th District when compared to the county or the state.

On cross-examination, Pallohusky testified that there were about six to eight districts in the city that had higher crime rates compared to the 14th District. Pallohusky also testified that there were one or two other districts with similar crime rates when compared to the 14th District. Despite the existence of other districts with higher crime rates, however, the crime rates for the 14th District places that district in the top 25% to 33% of all the districts in the city for violent crime and gun-related crime.

Employer introduced into evidence the deposition of Gerald Brandy, a private investigator and security consultant. Brandy opined that "[a]nybody that was in the restaurant was at the same risk that [claimant] was," or "[a]ny passerby," and therefore, claimant was not exposed to a greater risk of injury than the general public.

Following a hearing, the arbitrator issued a decision in which he found claimant proved she sustained accidental injuries arising out of and in the course of her employment with employer. The arbitrator noted that Brandy's opinions focused on "the immediate vicinity rather than the public at large" and, therefore, "his opinions are not helpful here." The arbitrator awarded claimant PTD benefits for life

pursuant to section 8(e)(18) of the Act, commencing on September 4, 1999. The arbitrator also ordered employer to pay $80,108.19 for necessary medical expenses incurred by the claimant.

Employer sought a review of the arbitrator's decision before the Commission. The Commission affirmed and adopted the arbitrator's decision. Thereafter, employer sought a judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision and this appeal followed.

In urging reversal of the circuit court's judgment, employer argues that the decision of the Commission is erroneous as a matter of law. We disagree.

An employee's injury is compensable under the Act only if it arises out of and in the course of the employment. 820 ILCS 305/2 (West 1998). Both elements must be present at the time of the claimant's injury in order to justify compensation. *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 483, 546 N.E.2d 603 (1989).

Injuries sustained on an employer's premises or at a place where the claimant might reasonably have been while performing his duties, and while a claimant is at work, are generally deemed to have been received in the course of the employment. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 57, 541 N.E.2d 665 (1989); *Wise v. Industrial Comm'n*, 54 Ill. 2d 138, 142, 295 N.E.2d 459 (1973). In this case, there is no doubt that claimant's injuries were sustained in the course of her employment. The issue is whether her injuries arose out of her employment.

■ Arising out of the employment refers to the origin or cause of the claimant's injury. "For an injury to 'arise out of' the employment its origin must be in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Caterpillar Tractor Co.*, 129 Ill. 2d at 58. There are three types of risks which an employee might be exposed to, namely: 1) risks distinctly associated with the employment; 2) risks which are personal to the employee; and 3) "neutral risks which have no particular employment or personal characteristics." *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 162, 731 N.E.2d 795 (2000). The risk of being struck by a stray bullet is a neutral risk. See *Illinois Institute of Technology*, 314 Ill. App. 3d at 163.

■ Whether an injury caused by a neutral risk arises out of employment is dependent upon whether claimant was exposed to a risk to a greater degree than the general public. *Illinois Institute of Technology*, 314 Ill. App. 3d at 163. The comparison should be made with a broad cross section of the public; not to a locality, neighborhood, or area. *Il-*

*linois Institute of Technology*, 314 Ill. App. 3d at 161. It is not enough that the employment placed claimant in a particular place at a particular time. This is known as positional risk and Illinois has expressly and repeatedly rejected this doctrine. *Illinois Institute of Technology*, 314 Ill. App. 3d at 163.

> "The focus then in the instant case is whether the conditions or environment of [the] employment increased [the] risk of being struck by a stray bullet over that of the general public. Again, if the only basis for finding that [the employee] sustained injuries was the fact that [the] employment placed him in the position where he was struck by a bullet at that time ('but for'), then the injuries would not arise out of [the] employment. This would be the classic positional risk situation. However, if the injury occurred not just because of where [the employee] was, at that particular time, but was coupled with some factor that increased the risk of being struck by a stray bullet, then the injury is said to arise out of his employment." (Emphases omitted.) *Illinois Institute of Technology*, 314 Ill. App. 3d at 164.

Whether an injury caused by a neutral risk arises out of the claimant's employment is a question of fact to be resolved by the Commission, and we will not disturb its determination unless it is against the manifest weight of the evidence. *Illinois Institute of Technology*, 314 Ill. App. 3d at 164.

■ The manifest weight of the evidence established that claimant was exposed to a stray bullet risk to a greater degree than that to which the general public is exposed. The evidence demonstrates that employer's restaurant was located in a high-crime area with rival street gangs feuding over turf. The crime data revealed that the restaurant was located in a police district whose crime rates for violent crimes and shootings placed it in the top 25% to 33% of all police districts in the City of Chicago. The assailants lived a short distance from the restaurant and were shooting at a rival gang member driving in the neighborhood. Claimant bartended near the restaurant's floor-to-ceiling windows, adjacent to the street, where her body was exposed. Further, there was a history of gunfire in the neighborhood spanning many years. Claimant's employment required her to work late at night, on weekends, when most of the shootings were taking place. Moreover, Pallohusky testified that claimant's employment at the Coast exposed her to a higher risk for random gunfire than the general public. Finally, the crime data for 1999 and prior years in the 14th police district demonstrated that the restaurant's risk for violent

crime and gun crimes was greater when compared with the crime data for the rest of the city, county, and State of Illinois. Claimant's exposure was not simply a matter of positional risk. The risks claimant was exposed to, including being struck by a stray bullet, by virtue of the conditions of her employment are not the same that the general public is commonly exposed to.

For the reasons stated, we affirm the circuit court's order confirming the Commission's decision.

Affirmed.

HOFFMAN, HUDSON, HOLDRIDGE, and DONOVAN, JJ., concur.